## UNITED STATES DISTRICT COURT MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

FABRICIO BOTTA,

    Plaintiff,

v.

DAVOL INC. and
C.R. BARD, INC.,

    Defendants.

Civil Action No.:

JURY TRIAL DEMANDED

------------------------------------------/

## ORIGINAL COMPLAINT

Plaintiff Fabricio Botta, by and through his counsel, brings this Complaint for damages against Defendants C.R. Bard, Inc. and Davol, Inc., and in support thereof states the following:

1.      This is a products liability case. Plaintiff Fabricio Botta developed serious and potentially life-threatening medical conditions caused by the surgical implantation of a defective Ventralex ST Mesh ("ST Bard Mesh") manufactured by Defendants C.R. Bard, Inc. ("Bard") and its subsidiary Davol, Inc. ("Davol"). Both Defendants were responsible for the design, manufacture, production, testing, study, inspection, labeling, marketing, advertising, sales, promotion and/or distribution of the ST Bard Mesh that caused Plaintiff's injuries.

2.      Scientific evidence shows that the ST coating, which is not used in any other hernia mesh product sold in the United States, incites an intense inflammatory response, leading to encapsulation, deformation, scarification and contraction, migration, excess adhesion formation, erosion and rejection. The impermeable ST coating inhibits proper tissue ingrowth and causes a tissue reaction that provides a breeding ground for infection and excessive adhesion type reactions. This ST coating also causes immunogenic response, and was known to be cytotoxic.

3.      As a result of having Defendants' ST Bard Mesh implanted in him, Plaintiff has experienced and/or continues to experience significant physical and mental pain and suffering, sustained permanent injury, undergone medical treatment and corrective surgery and hospitalizations, and suffered additional economic and non-economic damages.

## STATEMENT OF PARTIES

4.      Plaintiff currently resides in Lake Mary, Florida, and is a citizen and resident of Seminole County, Florida and the United States. He underwent hernia repair surgery on March 10, 2017 in Florida Hospital in Altamonte Springs, Florida. At that time, the ST Bard Mesh product that Defendants manufactured, designed, distributed, and warranted was implanted into him. His surgeon, medical staff, and other healthcare providers met or exceeded the standard of care applicable to the hernia surgery.

5.      Defendant C.R. Bard, Inc. ("Bard") is incorporated and based in New Jersey. Bard is a multinational marketer, promoter, seller, producer, manufacturer, and developer of medical devices. Bard controls the largest share of the hernia mesh market. Bard is the parent company of Davol. Bard participates in the manufacture and distribution of the Ventralex ST Mesh. It also manufactures and supplies Davol with material that forms part of the product.

6.      Davol, Inc. ("Davol") is incorporated in Delaware and has its principal place of business in Rhode Island. Davol is a medical device company involved in the research, development, testing, manufacture, production, marketing, promotion and/or sale of medical devices including "ST" hernia meshes composed of polypropylene, and polyglycolic acid (PGA) fibers coated with Sepra Technology a bioresorbable, chemically modified sodium hyalurnate carboxymethylcellulose, and polyethylene glycol-based hydrogel.

7.      At all material times, Bard was responsible for Davol's actions, and exercised control over its functions, specific to the oversight and compliance with applicable safety standards relating

to the Ventralex ST Mesh sold in the United States. In such capacity, Bard committed, or allowed to be committed, tortious and wrongful acts, including the violation of numerous safety standards relating to device manufacturing, quality assurance/control, and conformance with design and manufacturing specifications. Bard's misfeasance and malfeasance caused Plaintiff to suffer injury and damages.

8.      Defendants are individually, jointly and severally liable to Plaintiff for damages he suffered arising from Defendants' design, manufacture, marketing, labeling, distribution, sale and placement of the defective ST Bard Mesh at issue in the instant suit, effectuated directly and indirectly through their respective agents, servants, employees and/or owners, all acting within the course and scope of their representative agencies, services, employments and/or ownership.

9.      Defendants are vicariously liable for the acts and/or omissions of their employees and/or agents who were at all material times acting on behalf of Defendants and within the scope of their employment or agency.

## JURISDICTION & VENUE

10.     This Court has personal jurisdiction over both Defendants in that Plaintiff's cause of action against these Defendants arise from the Defendant's transaction of business in this State and/or their commission of tortious acts in this State as described in this Complaint. Further, Bard is registered to do business in this State and maintains a registered agent for service of process in this State.

11.     Defendants have substantial, systematic and continuous contact with this State such that exercise of personal jurisdiction over these Defendants is appropriate.

12.     Further, Defendants have purposely availed themselves to the privilege of conducting business within this State and have the requisite minimum contacts with this State such

that the maintenance of this suit does not offend traditional notions of fair play and substantial justice and that Defendants should reasonably anticipate being hailed into Court here.

13.     Specifically, Defendants transact business within the State of Florida, contracted to sell and supply their ST Bard Mesh products in the State of Florida, and committed tortious acts and omissions in Florida. Defendants' tortious acts and omissions caused injury to Plaintiff in the State of Florida. Defendants employ sales representatives in the State of Florida to sell their ST Bard Mesh products throughout the State, including the ST Bard Mesh implanted in Plaintiff. Defendants have purposefully engaged in Florida in the business of developing, manufacturing, publishing information, marketing, distributing, promoting and/or selling, either directly or indirectly, through third parties, as successor in interest, or other related entities, medical devices including ST Bard Mesh, for which they derived significant and regular income. Defendants intended and reasonably expected that that their defective mesh products, including ST Bard Mesh, would be sold and implanted in Florida and could cause injury in Florida.

14.     Defendants have and continue to conduct substantial business in the State of Florida and in this District, distribute ST Bard Mesh in this District, receive substantial compensation and profits from sales of ST Bard Mesh in this District, and make material omissions and misrepresentations and breaches of warranties in this District, so as so subject them to in person am jurisdiction in this District.

15.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), based on complete diversity of citizenship between Plaintiff and all Defendants. The amount in controversy exceeds $75,000.

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the events or omissions giving rise to Plaintiff claims occurred in this District.

## FACTS COMMON TO ALL COUNTS

17.     On or about March 09, 2017, Plaintiff underwent laparoscopic repair of an umbilical hernia by Eric Rideman at Florida Hospital in Altamonte Springs, FL. A Ventralex ST Bard Mesh was implanted in Plaintiff during this repair.

18.     Defendants manufactured, sold, and/or distributed the ST Bard Mesh to Plaintiff, through his doctors, to be used for treatment of hernia repair.

19.     On or about June 22, 2017, Plaintiff underwent surgery to remove the failed ST Bard Mesh at Florida Hospital in Altamonte Springs, FL by Eric Rideman.

20.     Bard was at all material times responsible for the actions of Davol, and exercised control over Davol's functions specific to the oversight and compliance with applicable safety standards relating to and including ST Bard Mesh sold in the United States. In such capacity, Defendants committed or allowed to be committed tortious and wrongful acts, including the violation of numerous safety standards relating to device manufacturing, quality assurance/control, and conformance with design and manufacturing specifications. Their misfeasance caused Plaintiff to suffer injury and damages.

21.     Defendants were responsible for the research, design, development, testing, manufacture, production, marketing, promotion, distribution and sale of ST Bard Mesh, including providing the warnings and instructions concerning the product.

22.     Among the intended purposes for which Defendants designed, manufactured and sold ST Bard Mesh was the use by surgeons for hernia repair surgeries, the purpose for which the ST Bard Mesh was implanted in Plaintiff.

23.     Defendants represented to Plaintiff and his physicians that ST Bard Mesh was a safe and effective product for hernia repair.

## THE FDA'S 510(k) CLEARANCE PROCESS

24.     The 510(k) clearance process refers to Section 510(k) of the Medical Device Amendments of 1976 MDA of the Federal Food, Drug and Cosmetic Act. Under this process, device manufacturers are only required to notify the FDA at least 90 days before they market a device claimed to be "substantially equivalent" to a device the FDA had approved for sale before 1976, when the MDA was enacted.

25.     No clinical testing is required under this process.

26.     Subsequent amendments to the MDA allowed for 510(k) clearance of products deemed "substantially equivalent" to post-MDA, 510(k)-cleared devices.

27.     Through this domino effect, devices deemed "substantially equivalent" to devices previously deemed "substantially equivalent" to devices approved for sale by the FDA before 1976 could be sold to patients in a matter of 90 days without any clinical testing.

28.     Clearance for sale under the 510(k) process does not equate to FDA approval of the cleared device.

29.     In 2012, at the request of the FDA, the National Institute of Health (NIH) conducted a thorough review of the 510(k) process, coming to the following major conclusion: The 510(k) clearance process is not intended to evaluate the safety and effectiveness of medical devices with some exceptions. The 510(k) process cannot be transformed into a pre-market evaluation of safety and effectiveness so long as the standard for clearance is substantial equivalence to any previously cleared device.

30.     The NIH explained, "The assessment of substantial equivalence does not require an independent demonstration that the new device provides a 'reasonable assurance of safety and effectiveness.'" Further, the NIH even pointed out that the classification of predicate devices approved for sale prior to the 1976 MDA "did not include any evaluation of the safety and

effectiveness of individual medical devices . . .Thus it is common for devices to be cleared through the 510(k) program by being found substantially equivalent to devices that were never individually evaluated for safety and effectiveness, either through the original device classification program or through the 510(k) process."

31.     Defendants cleared the ST Bard Mesh, and its related components, under the 510(k) Premarket Notification. Under Section 510(k) of the Federal Food, Drug and Cosmetic Act, a medical device does not have to go through the rigors of a clinical study to gain approval by the FDA. Instead, the device was supposed to demonstrate substantial equivalence to a predicate medical device.

32.     On June 18, 2002, the Food and Drug Administration issued a document titled "Guidance for Resorbable Adhesion Barrier Devices for Use in Abdominal and/or Pelvic Surgery; Guidance for Industry." The 26 page document starts by explaining:
FDA has determined that the resorbable adhesion barrier is a significant risk device as defined in 21 CFR 812.3(m)(4). The resorbable adhesion barrier is a class III device which is subject to premarket approval in accordance with section 515 of the Federal Food, Drug, and Cosmetics (FD&C) Act.

## ESTOPPEL AND TOLLING OF STATUTE OF LIMITATIONS

33.     Defendants are estopped from relying on any statues of limitations or repose by virtue of their acts of fraudulent concealment, which include the Defendants' intentional concealment from Plaintiff and the general public that the ST Bard Mesh is defective, while continually marketing the ST Bard Mesh with the effects described in this Complaint.

34.     Given the Defendants' affirmative actions of concealment by failing to disclose this known but non-public information about the defects—information over which the Defendants had exclusive control—and because Plaintiff could not reasonably have known the ST Hernia Mesh was defective, Defendants are estopped from relying on any statutes of limitations.

## COUNT I: STRICT LIABILITY – FAILURE TO WARN

35.     Plaintiff incorporates by reference the allegations in all prior paragraphs.

36.     When the ST Bard Mesh that was implanted in Plaintiff's body, the warnings and instructions provided by Defendants were inadequate and defective. As described above, there was an unreasonable risk that the product would not perform safely and effectively for the purposes for which it was intended, and Defendants failed to design and/or manufacture against such dangers, and failed to provide adequate warnings and instructions concerning these risks.

37.     Defendants expected and intended the ST Bard Mesh product to reach users such as Plaintiff in the condition in which the product was sold.

38.     Plaintiff and Plaintiff's physicians were unaware of the defects and dangers of ST Bard Mesh, and were unaware of the frequency, severity and duration of the risks associated with the ST Bard Mesh.

39.     Defendants' Instructions for Use provided with the ST Bard Mesh expressly understate and misstate the risks known to be associated specifically with the ST Bard Mesh, by representing complications such as inflammation associated with the ST Bard Mesh as "possible complications." The ST Bard Mesh will always incite severe inflammation once implanted. The inflammation caused by the ST Bard Mesh is chronic in nature and systemic, not acute localized inflammation. No other surgical mesh sold in the United States has the dangerous and defective ST coating, which itself causes or increases the risks of numerous complications, including increased risk of excess adhesion formation, immunologic response, increased risk for infection, and increased inflammatory reaction and foreign body response. Defendants provided no warning to physicians about the risks or increased risks specifically associated with the unique design of the ST Mesh.

40.     Defendants' Instructions for Use for the ST Mesh failed to adequately warn Plaintiff's physicians of numerous risks that Defendants knew or should have known were

associated with the ST Mesh, including the risks of immunologic response, pain, dehiscence, encapsulation, rejection, migration, scarification, contraction, adhesion to internal organs and viscera, erosion through adjacent tissue and viscera, bowel obstruction, or hernia incarceration or strangulation.

41.     Defendants failed to adequately train or warn Plaintiff or his physician about the necessity for invasive surgical intervention in the event of complications, or how to properly treat such complications when they occurred.

42.     Defendants failed to adequately warn Plaintiff or his physician that the surgical removal of the ST Bard Mesh in the event of complications would leave the hernia unrepaired. The resulting hernia would be much larger than the original, and would necessitate further, more complicated medical treatment to attempt to repair the same hernia that the failed ST Mesh was intended to treat.

43.     Defendants represented to physicians, including Plaintiff's physician, that the ST coating would prevent or reduce adhesions, and expressly intended for the ST Mesh to be implanted in contact with the bowel and internal organs and marketed and promoted the product for that purpose. Defendants failed to warn physicians that the ST coating was only temporary and therefore at best would provide only a temporary adhesion barrier; and when the coating inevitably degraded, the exposed polypropylene and PGA would become adhered to the bowel or tissue.

44.     Defendants failed to warn Plaintiff and his physician that the FDA considered the ST Bard Mesh a significant risk device.

45.     Defendants marketed and continue to market the ST Bard Mesh in brochures and online without disclosing or making evident that PGA is utilized in the ST Bard Mesh.

46.     With respect to the complications listed in the Defendants' warnings, they provided no information or warning regarding the frequency, severity and duration of those complications,

even though the complications associated with ST Bard Mesh were more frequent and more severe, and lasted longer than those with safer feasible alternative hernia repair treatments.

47.     If Plaintiff and/or his physicians had been properly warned of the defects and dangers of ST Bard Mesh, and of the frequency, severity and duration of the risks associated with the ST Bard Mesh, Plaintiff would not have consented to allow the ST Bard Mesh to be implanted, and his physician would not have implanted the ST Bard Mesh in Plaintiff.

48.     As a direct and proximate result of the inadequate and defective warnings and instructions, Plaintiff suffered injuries and damages as summarized in this Complaint.

## COUNT II: STRICT LIABILITY – MANUFACTURING DEFECT

49.     Plaintiff incorporates by reference the allegations in all prior paragraphs.

50.     Defendants expected and intended the ST Bard Mesh product to reach users such as Plaintiff in the condition in which the product was sold.

51.     The implantation of ST Bard Mesh in Plaintiff's body was medically reasonable, and was a type of use that Defendants intended and foresaw when they designed, manufactured and sold the product.

52.     When the ST Bard Mesh that was implanted in Plaintiff's body, the product was defectively manufactured.

53.     Defendants' poor-quality control and general non-compliance resulted in the non-conformance of the ST Bard Mesh implanted in Plaintiff. The ST Bard Mesh implanted in Plaintiff did not conform to Defendants' intended manufacturing and design specifications.

54.     Upon information and belief, Defendants utilized substandard and adulterated polypropylene and raw materials used to make the ST coating on their finished ST Bard Meshes, which deviated from Defendants' material and supply specifications.

10

55.     As a direct and proximate result of the defective manufacture of the ST Bard Mesh, Plaintiff suffered injuries and damages as summarized in this Complaint.

## COUNT III: NEGLIGENCE

56.     Plaintiff incorporates by reference the allegations in all prior paragraphs.

57.     Defendants had a duty to use reasonable care in designing, testing, inspecting, manufacturing, packaging, labeling, marketing, distributing, and preparing written instructions and warnings for ST Bard Mesh, but failed to do so. Defendants' breach of this duty proximately caused Plaintiff's damages.

58.     Defendants knew, or in the exercise of reasonable care should have known, that ST Bard Mesh was defectively and unreasonably designed and/or manufactured, and was unreasonably dangerous and likely to injure patients in whom ST Bard Mesh was implanted. Defendants knew or should have known that Plaintiff and Plaintiff's physicians were unaware of the dangers and defects inherent in the ST Bard Mesh.

59.     As a result of the defective design and/or manufacture of the ST Bard Mesh, there was an unreasonable risk of severe adverse reactions to the mesh or mesh components including: chronic pain; recurrence of hernia; foreign body response; rejection; infection; scarification; improper wound healing; excessive and chronic inflammation; allergic reaction; adhesions to internal organs; erosion; abscess; fistula formation; granulomatous response; seroma formation; nerve damage; tumor formation, cancer, tissue damage and/or death; and other complications.

60.     When affixed to the body's tissue, the impermeable coating of the ST Mesh prevents fluid escape, which leads to seroma formation, and which in turn can cause infection or abscess formation and other complications.

61.     The ST coating provides an ideal bacteria breeding ground in which the bacteria cannot be eliminated by the body's immune response, which allows infection to proliferate.

62.     Defendants utilize Ethylene Oxide ("ETO") in an attempt to sterilize the ST Mesh. ETO is an effective disinfectant; however, dry spores are highly resistant to ETO. Moisture must be present to eliminate spores using ETO. Presoaking the product to be sterilized is most desirable, but high levels of humidity during the ETO process can also be effective in eliminating spores. ST Mesh implanted with spores will eventually result in an infection. The spores can remain dormant for extended periods of time, resulting in infections months or years after implantation with the ST Mesh. The following non-exhaustive literature discusses the necessity of moisture during ETO sterilization:

> In January of 1989, a review on sterilization methods of medical devices was published in the Journal of Biomaterials Applications. ETO was among the sterilization methods reviewed. ETO was noted to be highly resistant to dry spores, moisture must be present; presoaking most desirable. Experiments demonstrated the importance of the state of humidification of organisms at the time of their exposure to ETO. Desiccation of the spores prior to ETO exposure produces a small but significant percentage of organisms which are highly resistant to the sterilization process. Similar resistance to destruction by ETO occurs in desiccated staphylococcus aureus. Rehumidification of such organisms can require prolonged exposure to an atmosphere having a 50 to 90 percent relative humidity. Moisture has been found to be a critical factor in achieving sterility with gaseous ETO. No gas sterilizer can effectively kill desiccated spores.

Dempsey, D.J. and Thirucote, R.R., Sterilization of medical devices: A Review. Journal of Biomaterials Applications, 3(3), pp. 454-523 (1988). DOI: 10.1177/088532828800300303

63.     The ST Bard Mesh is acidic, causing bacteriostasis (inhibition of the growth of bacteria without killing the bacteria), which results in the inability to properly validate sterilization.

64.     The coating on the Defendants' ST Bard Mesh is cytotoxic, immunogenic, and not biocompatible, which causes or contributes to complications such as delayed wound healing, inflammation, foreign body response, rejection, infection, and other complications.

65.     The ST coating is designed and intended to resorb in less than 30 days.

66.     When the ST coating is disrupted, degrades, and/or resorbs, the "naked" polypropylene mesh and PGA is exposed to the adjoining tissue and viscera, and can become adhered to organs, and cause incarceration of organs, and fistula formation.

67.     The solid, flat, relatively smooth and continuous surface of the ST Bard Mesh inhibits the body's ability to clear toxins.

68.     These manufacturing and design defects associated with the ST Bard Mesh were directly and proximately related to the injuries suffered by Plaintiff.

69.     Neither Plaintiff nor Plaintiff's implanting physician were adequately warned or informed by Defendants of the defective and dangerous nature of ST Bard Mesh. Moreover, neither Plaintiff nor Plaintiff's implanting physician were adequately warned or informed by Defendants of the risks associated with the ST Bard Mesh.

70.     The ST Bard Mesh implanted in Plaintiff failed to reasonably perform as intended. The ST Bard Mesh caused serious injury and had to be surgically removed via invasive surgery.

71.     At the time the ST Bard Mesh that was implanted in Plaintiff's body, the product was defectively designed. As described above, there was an unreasonable risk that the ST Bard Mesh would not perform safely and effectively for the purposes for which it was intended, and Defendants failed to design against such dangers, and failed to provide adequate warnings and instructions concerning these risks.

72.     Defendants expected and intended the ST Bard Mesh product to reach users such as Plaintiff in the condition in which the product was sold.

73.     The implantation of ST Bard Mesh in Plaintiff's body was medically reasonable, and was a type of use that Defendants intended and foresaw when it designed, manufactured and sold the product.

74.     The risks of the ST Bard Mesh significantly outweigh any benefits that Defendants contend could be associated with the product. The ST coating, which is not used in any other hernia mesh product sold in the United States, incites an intense inflammatory response, leading to encapsulation, deformation, scarification and contraction, migration, erosion and rejection. The impermeable ST coating leads to seroma formation, and provides a breeding ground for infection, and protects bacteria from being eliminated by the body's natural immune response. This ST coating also caused immunogenic response, and was known to be cytotoxic.

75.     The coating of the ST Bard Mesh, which was marketed, promoted and intended as a barrier against adhesion to the bowel, was only temporary; it was expected and intended to degrade over time inside the body. Thus, this coating prevented tissue in growth in the short term, and degraded in the long-term, eventually leaving the "naked" polypropylene mesh and PGA exposed to the internal viscera and tissues. Once exposed to the viscera, the polypropylene and PGA will inevitably adhere to the viscera, initiating a cascade of adverse consequences. Any purported beneficial purpose of the coating (to prevent adhesion to the bowel and internal viscera) was non-existent; the product provided no benefit while substantially increasing the risks to the patient.

76.     The polypropylene mesh within the defective coating of the ST Mesh was in itself dangerous and defective, particularly when used in the manner intended by Defendants in the ST Bard Mesh. The particular polypropylene material used in the ST Bard Mesh was substandard, adulterated and non-medical grade, and was unreasonably subject to oxidative degradation within the body, further exacerbating the adverse reactions to the product once the ST coating degraded. When implanted adjacent to the bowel and other internal organs, as Defendants intended for ST Bard Mesh, polypropylene mesh is unreasonably susceptible to adhesion, bowel perforation or erosion, fistula formation and bowel strangulation or hernia incarceration, and other injuries.

77.     The appropriate treatment for complications associated with ST Bard Mesh involves additional invasive surgery to remove the mesh from the body, thus eliminating any purported benefit that the mesh was intended to provide to the patient.

78.     The ST Bard Mesh was designed and intended for intraperitoneal implantation, which required the product to be placed in contact with internal organs, which unnecessarily increased the risks of adhesion, erosion, fistula formation, and other injuries.

79.     At the time the ST Bard Mesh was implanted in Plaintiff, there were safer feasible alternative designs for hernia mesh products, including but not limited to, a flat, non-coated, single-layer mesh placed away from the bowel.

80.     The ST Bard Mesh product cost significantly more than competitive products because of its unique ST coating, even though the ST coating provided no benefit to consumers, and increased the risks to patients implanted with these devices.

81.     The ST Bard Mesh has a solid, flat, relatively smooth and continuous surface. Medical devices which utilize this design greatly increase the risk of tumor and cancer formation via the "Oppenheimer Effect":

A.      In 1958, a study supported by a research grant from the National Cancer Institute titled The Latent Period in Carcinogenesis by Plastics in Rats and its Relation to the Presarcomatous Stage was published in the Journal of Cancer. The presence of polymer in a sheet form appears to be of primary importance, as shown by the manifold increase in the percentage of tumors induced by this form, as opposed to textiles, sponges, powders, etc. This may act in some way as a block to the free interchange of tissue constituents, subjecting some cells to an altered environment and changing their pattern of growth. Whether the primary cause is lack of nutrients or oxygen, or the accumulation of products of metabolism, or even a freeing of the cell from some hormonal control, is not a present clear, but undoubtedly the cell is placed under conditions that are favorable to autonomous, unregulated growth. Plastics embedded subcutaneously in rodents in film or sheet form induce malignant tumors in significant numbers (up to 50%), but embedded in other forms, such as textiles, sponges, or powders, they induce tumors only rarely.

Oppenheimer, B.S. et al, The Latent Period in Carcinogenesis by Plastics in Rats and its Relations to the Presearcomatous Stage. Journal of Cancer 1(11). 204 – 213 (1958).

    B.    In 1999, the World Health Organization's International Agency for Research on Cancer published Surgical implants and Other Foreign Bodies, which evaluated the carcinogenic risks of various surgical implants in humans. Polymeric implants prepared as thin smooth films are possibly carcinogenic to humans.

Surgical Implants and Other Foreign Bodies. IARC Monogr Eval Carcinog Risks Hum 74:1-409 (1999).

82.    Plaintiff was implanted with a Ventralex ST Mesh, which also includes an inner ring of polydioxanone (hereinafter PDO ring), to aid in the memory and stability of the device. The inner PDO ring is called SorbaFlex Memory Technology.

83.    The PDO ring breaks down via hydrolysis over a period of at least 6 to 8 months once implanted. The PDO ring elicits an intense inflammatory response during absorption.

84.    Defendants secure the ST coating to the polypropylene base of the mesh by suturing two circular rings of PGA. The two securing circular rings of PGA are not ST coated and are the closest part of the mesh to underlying organs once implanted. This results in significant amounts of bare PGA being exposed to underlying organs at the time of implantation.

85.    The two securing circular rings of PGA which secure the ST coating to the polypropylene have a tendency to come unstitched, resulting in segments of PGA protruding toward the underlying organs.

86.    The method by which the Defendants secure the ST coating to the polypropylene base of the mesh does not provide adequate or uniform coverage to the outer aspects of the base polypropylene from the time of implantation.

87.    The securing circular rings of PGA do not extend to the outer aspects of the polypropylene base, which can result in the ST coating folding upon itself and exposing bare polypropylene.

88.     The positioning/securing strap of the Ventralex ST Mesh is bare polypropylene without an ST coating.

89.     The instructions for use for the Ventralex ST Mesh instruct to secure the ST Mesh with tacks or sutures through the polypropylene positioning straps.

90.     The polypropylene positioning straps have a tendency to tear at the base of the ST Mesh after implantation, resulting in mesh migration and other injuries.

91.     The polypropylene positioning straps have a tendency to tear where tacked or sutured, resulting in mesh migration and other injuries.

92.     The polypropylene portion of the ST Bard Mesh has a tendency to unravel, creating a sharp "fishing line" effect, which can slice through the patient's tissue.

93.     The additional layers utilized to create the patch of the Ventralex ST Mesh increases the intensity and duration of inflammation and foreign body response.

94.     The ST Bard Mesh implanted in Plaintiff failed to reasonably perform as intended, and had to be surgically removed necessitating further invasive surgery to repair the very issue that the product was intended to repair, and thus provided no benefit to him.

95.     As a direct and proximate result of the defective and unreasonably dangerous condition of the product, Plaintiff suffered injuries and damages as summarized herein.

96.     Defendants knew or should have known that the MSDS for the polypropylene used to manufacturer its ST Mesh prohibited permanently implanting the polypropylene into the human body.

97.     Defendants utilized non-medical grade polypropylene.

98.     Defendants knew or should have known that polypropylene is not inert and would degrade, flake, chip, and disperse throughout the body once implanted.

99.     Defendants knew or should have known that polypropylene incites a severe inflammatory response once implanted and continues to incite a severe inflammatory response indefinitely or until removed.

100.    Defendants knew or should have known that every piece of polypropylene that flakes off and migrates throughout the body also incites its own chronic inflammatory response wherever it embeds.

101.    Defendants knew or should have known that PGA induces an intense local inflammatory response following implantation.

102.    Defendants knew or should have known that carboxymethylcellulose induces an intense local inflammatory response following implantation.

103.    Defendants knew or should have known of the cytotoxic and immunogenic properties of the coating on the ST Mesh prior to introducing it into the stream of commerce.

104.    As a direct and proximate result of Defendants' negligence in designing, testing, inspecting, manufacturing, packaging, labeling, marketing, distributing, and preparing written instructions and warnings for ST Bard Mesh, Plaintiff suffered injuries and damages as summarized this Complaint.

## COUNT IV: BREACH OF EXPRESS WARRANTY

105.    Plaintiff incorporates the allegations in all prior paragraphs, and further alleges as follows:

106.    At all relevant times, Defendants manufactured, distributed, advertised, promoted, and sold the ST Bard Mesh.

107.    At all relevant times, Defendants intended the St Bard Mesh be used in the manner that Plaintiff  in fact used it and Defendants expressly warranted in its brochures and advertising that each product was safe and fit for use by consumers, that it was of merchantable quality, that its side

effects were minimal and comparable to other mesh products, and that it was adequately tested and fit for its intended use.

108.     At all relevant times, Defendants were aware that consumers, including Plaintiff, would use the ST Bard Mesh. Therefore, Plaintiff was a foreseeable user of Defendants' ST Bard Mesh.

109.     Plaintiff and/or his implanting physician were at all relevant times in privity with Defendants.

110.     Defendants' ST Bard Mesh was expected to reach and did in fact reach consumers, including Plaintiff and his implanting physician, without substantial change in the condition in which it was manufactured and sold by Defendants.

111.     Defendants breached various express warranties with respect to the ST Bard Mesh, including the following particulars:

   A.     Defendants represented to Plaintiff and his physicians and healthcare providers through their labeling, advertising marketing materials, detail persons, seminar presentations publications, notice letters, and regulatory submissions that the ST Bard Mesh was safe and fraudulently withheld and concealed information about substantial risks or serious injury and/or death associated with using the ST Bard Mesh;

   B.     Defendants represented to Plaintiff and his physicians and healthcare providers that their ST Bard Mesh was as safe, and/or safer than other alternative procedures and devices and fraudulently concealed information, which demonstrated that the ST Bard Mesh was not safer than alternatives available on the market; and

   C.     Defendants represented to Plaintiff and his physicians and healthcare providers that the ST Bard Mesh was more efficacious than other alternatives and fraudulently concealed information regarding the true efficacy of the ST Bard Mesh.

112.    In reliance upon Defendants' express warranty, Plaintiff was implanted with Defendants' ST Bard Mesh as prescribed and directed, and therefore, in the foreseeable manner normally intended, recommended, promoted, and marketed by Defendants.

113.    At the time of making such express warranties, Defendants knew or should have known that the ST Bard Mesh does not conform to these express representations because the St Bard Mesh was not safe and had numerous serious side effects, many of which Defendants did not accurately warn about, thus making the ST Bard Mesh unreasonably unsafe for its intended purpose.

114.    Members of the medical community, including physicians and other healthcare professionals, as well as Plaintiff and the public, relied upon the representations and warranties of Defendants in connection with the use recommendation, description, and/or dispensing of the ST Bard Mesh.

115.    Defendants breached their express warranties to Plaintiff in that the ST Bard Mesh was not of merchantable quality, safe, and fit for its intended purpose, nor was it adequately tested.

116.    As a direct and proximate result of Defendants' conduct, Plaintiff has sustained and will continue to sustain severe physical injuries, severe emotional distress, mental anguish, economic losses, and other damages.

## COUNT V: FRAUDULENT CONCEALMENT

117.    Plaintiff incorporates the allegations in all prior paragraphs, and further alleges as follows:

118.    At all material times, it was known or knowable to Defendants that their ST Bard Mesh caused large numbers of complications. Moreover, it was known or knowable to Defendants that the surgical technique and training of implanting physicians was not the cause of the adverse events associated with these devices. It was known or knowable to Defendants that the safety and efficacy of its ST Bard Mesh had not been proven with respect to, among other things, the product,

its components, its performance, and its method of insertion. It was known or knowable to Defendants that these devices were not safe and effective. Defendants continued to represent that its ST Bard Mesh was safe and effective.

119.    Despite what was known or knowable to Defendants about the lack of safety and efficacy of its ST Bard Mesh, Defendants failed to disclose this information to Plaintiff, to Plaintiff's physicians, and to the public at large.

120.    At all material times, Defendants had the duty and obligation to disclose to Plaintiff and Plaintiff's physicians the true facts concerning the ST Bard Mesh, that is, that it was dangerous and defective, lacking efficacy for its purported use and lacking safety in normal use, and how likely it was to cause serious consequences to users, including permanent and debilitating injuries. Defendants concealed these material facts prior to the time that Plaintiff was implanted with Defendants' ST Bard Mesh.

121.    Defendants were under a duty to Plaintiff to disclose and warn of the defective nature of the ST Bard Mesh because:

A.    Defendants were in a superior position to know the true quality, safety, and efficacy of their ST Bard Mesh;

B.    Defendants knowingly made false claims about the safety and quality of its ST Bard Mesh in documents and marketing materials;

C.    Defendants fraudulently and affirmatively concealed the defective nature of the ST Bard Mesh from Plaintiff.

122.    The facts concealed and/or not disclosed by Defendants to Plaintiff were material facts that a reasonable person would have considered to be important in deciding whether or not to purchase and/or use the Defendants' ST Bard Mesh.

123.     At relevant times, Defendants and each of them, willfully, intentionally, and maliciously concealed facts as set forth above from Plaintiffs and their physicians with the intent to defraud, as alleged in this Complaint.

124.     Defendants intentionally concealed and/or failed to disclose the true defective nature of the ST Bard Mesh so that Plaintiff would request and purchase Defendants ST Bard Mesh, and his healthcare providers would dispense, prescribe, and recommend Defendants' ST Bard Mesh, and Plaintiff justifiably acted or relied upon the concealed and/or non-disclosed facts to his detriment.

125.     At all material times, neither Plaintiff nor his physicians were aware of the facts set forth above, and had they been aware of said facts, they would not have acted as they did, that is, would not have reasonably relied upon said representations of safety and efficacy and utilized Defendants' ST Bard Mesh in their treatment. Defendants' failure to disclose this information was a substantial factor in Plaintiff's physicians selecting Defendants' ST Bard Mesh. The failure to disclose also resulted in the provision of incorrect and incomplete information to Plaintiff, as a patient.

126.     As a direct and proximate result of this conduct, Plaintiff was injured.

## PUNITIVE DAMAGES ALLEGATIONS

127.     Plaintiff  incorporates by reference the allegations in all prior paragraphs.

128.     Defendants failed to adequately test and study the ST Bard Mesh to determine and ensure that the product was safe and effective prior to releasing it for sale for permanent human implantation; and Defendants continued to manufacture and sell ST Bard Mesh after obtaining knowledge and information that the product was defective and unreasonably unsafe.

129.     Even though Defendants have other hernia repair mesh devices that do not present the same risks as the ST Bard Mesh, Defendants developed, designed and sold ST Bard Mesh, and continue to do so, because the ST Bard Mesh has a significantly higher profit margin than other

hernia repair products. Defendants were aware of the probable consequences of implantation of the dangerous and defective ST Bard Mesh, including the risk of failure and serious injury, such as suffered by Plaintiff.

130.    At all material times, Defendants knew or should have known that ST Bard Mesh was inherently more dangerous with respect to the risk of foreign body response, allergic reactions, rejection, infection, failure, erosion, pain and suffering, organ perforation, dense adhesions, tumor or cancer formation, loss of life's enjoyment, remedial surgeries and treatments in an effort to cure the conditions proximately related to the use of the product, as well as the other severe and personal injuries which are permanent and lasting in nature.

131.    Defendants' misrepresentations included knowingly withholding material information from the medical community and the public, including Plaintiff, concerning the safety and efficacy of the ST Bard Mesh, thereby depriving Plaintiff and his implanting physician of vitally necessary information with which to make a fully informed decision about whether to use ST Bard Mesh.

132.    At all material times, Defendants knew and recklessly and/or intentionally disregarded the fact that Defendants' ST Bard Mesh can cause debilitating and potentially life-threatening side effects with greater frequency than safer alternative methods, products, procedures, and/or treatment.

133.    At all material times, Defendants knew and recklessly and/or intentionally disregarded the fact that ST Bard Mesh can cause debilitating and potentially life-threatening side effects with greater frequency than safer alternative products and/or methods of treatment and recklessly failed to advise the medical community and the general public, including Plaintiff, of these facts.

134.    At all material times, Defendants intentionally misstated and misrepresented data, and continue to misrepresent data, so as to minimize the perceived risk of injuries and the rate of complications associated with ST Bard Mesh.

135.    Notwithstanding the foregoing and the growing body of knowledge and information regarding the true and defective nature of ST Bard Mesh, with its increased risk of side effects and serious complications, Defendants continue to aggressively market the ST Bard Mesh to the medical community and to consumers without disclosing the true risk of such complications.

136.    When Plaintiff  was implanted with the ST Bard Mesh, and since then, Defendants knew that ST Bard Mesh was defective and unreasonably dangerous. But they continued to manufacture, produce, assemble, market, distribute, and sell the product so as to maximize sales and profits at the expense of the health and safety of the public in a conscious, reckless and/or intentional disregard of the likely and foreseeable harm caused by ST Bard Mesh to members of the public including Plaintiff.

137.    At all material times, Defendants have concealed and/or failed to disclose to the public the serious risks and the potential complications associated with ST Hernia Mesh, in order to ensure continued and increased sales and profits and to the detriment of the public, including Plaintiff.

138.    Defendants' conduct, acts and omissions, as described in this Complaint, are of such character and nature so as to entitle Plaintiff to an award of punitive damages in accordance with applicable statutory and common law. Defendants' conduct shows willful misconduct, malice, fraud, wantonness, oppression, gross negligence, or that entire want of care raising the presumption of conscious indifference to consequences, thereby justifying an award of punitive damages

WHEREFORE, Plaintiff Fabricio Botta demands judgment against Defendants individually, and jointly and severally; and requests compensatory damages, punitive damages or enhanced

compensatory damages, together with interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

## PRAYER FOR RELIEF

Plaintiff Fabricio Botta demands judgment against Defendants, and each of them, individually, jointly and severally and prays for the following relief in accordance with applicable law and equity:

i.      Compensatory damages to Plaintiff for past, present, and future damages, including but not limited to, pain and suffering for severe and permanent personal injuries he sustained, permanent impairment, mental pain and suffering, loss of enjoyment of life, health and medical care costs, economic damages, together with interest and costs as provided by law;

ii.     restitution and disgorgement of profits;

iii.    punitive damages;

iv.     reasonable attorneys' fees as provided by law;

v.      past and future cost of all proceedings;

vi.     all ascertainable economic damages;

vii.    prejudgment interest on all damages as allowed by law; and

viii.   such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff Fabricio Botta hereby demands a trial by jury on all issues so triable.

Dated: April 23, 2019

/s/ Michael D. Sechrest, Esq.
Florida Bar No.: 0150710
D. Marc Warner, Esq.
Florida Bar No. 0151238
Sean G. Hipworth

Florida Bar No.: 121246
5200 SW 91st Terrace, Suite 101
Gainesville, FL 32608
Lead Counsel for Plaintiff

<u>Michael Massey, Esq.</u>
Massey@352law.com
Fla. Bar No. 153680
Massey & Duffy, P LLC
855 E. University Ave.
Gainesville, FL 32601
Co-Counsel for Plaintiff